Filed 6/28/22 (unmodified opinion attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re DEZI C. et al., Persons Coming Under the Juvenile Court Law. | B317935<br>(Los Angeles County Super. Ct. No. 19CCJP08030A-B) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>　　　Plaintiff and Respondent,<br><br>　　v.<br><br>ANGELICA A.,<br><br>　　　Defendant and Appellant. | ORDER MODIFYING OPINION AND DENYING REHEARING<br><br>NO CHANGE IN THE JUDGMENT |

THE COURT:

It is ordered that the opinion filed herein on June 14, 2022, be
modified as follows:

1. On page 2, in the penultimate sentence of the first paragraph,
replace the word "fulsome" with "comprehensive."

2. On page 7, in the last sentence before heading I., replace
"fulsome" with "comprehensive."

3. On page 10, delete the text in footnote 4, and replace it with
the following text, so that footnote 4 now reads:

Considering such proffers in this context is appropriate
under Code of Civil Procedure section 909 because they bear on
the collateral issue of prejudice rather than the substantive
merits and because they expedite the proceedings and promote
finality of the juvenile court's orders. (*A.C.*, *supra*, 65
Cal.App.5th at pp. 1071-1073 [so holding, as to parental proffers
regarding prejudice]; see *In re Allison B.* (2022) 79 Cal.App.5th
214, 218-220 [considering extra-record evidence in evaluating
whether deficiency in ICWA inquiry had been subsequently
cured]; see generally, *In re Josiah Z.* (2005) 36 Cal.4th 664, 676
[noting that extra-record evidence may be considered under
circumstances delineated above]; *In re A.B.* (2008) 164
Cal.App.4th 832, 841-844 [same].)

\*    \*    \*

There is no change in the judgment.

Appellant's petition for rehearing is denied.

_____

ASHMANN-GERST, Acting P. J.   CHAVEZ, J.   HOFFSTADT, J.

Filed 6/14/22 (unmodified opinion)
**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re DEZI C. et al., Persons Coming Under the Juvenile Court Law. | B317935 (Los Angeles County Super. Ct. No. 19CCJP08030) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. ANGELICA A., Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Robin R. Kesler, Judge Pro Tempore.  Affirmed.

Karen J. Dodd, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, Acting County Counsel, Kim Nemoy, Assistant County Counsel, and Stephen Watson, Deputy County Counsel, for Plaintiff and Respondent.

\* \* \* \* \* \*

This juvenile dependency case presents what is unfortunately becoming a common scenario. Both parents of the two children at issue in this case repeatedly denied having any American Indian heritage. While the case was ongoing, the social services agency spoke with several of the parents' relatives (including the parents' parents, their siblings and the father's cousin), but never asked those relatives whether the children had any American Indian heritage. Nearly 30 months into the proceedings and on appeal from the termination of her parental rights, Angelica A. (mother) is for the first time objecting that the agency did not discharge its statutory duty to "inquire" of "extended family members" whether her children might be "Indian child[ren]" within the meaning of our state's broader version of the federal Indian Child Welfare Act (ICWA) (25 U.S.C. § 1900 et seq.) (Welf. & Inst. Code, § 224.2, subd. (b)), and is seeking a remand for the agency to conduct a more fulsome inquiry on this topic.[1] There is no dispute that the agency did not properly discharge its statutory duty, and that there is therefore "ICWA error."

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2

The question before us now is whether this error was harmless and, more to the point, *how* harmlessness is to be assessed where an agency has failed to conduct the statutorily required initial inquiry into a dependent child's American Indian heritage. So far, the courts have developed three different rules—at various points along a continuum—for assessing harmlessness. In our view, the proper rule lies at a different point on that continuum. We accordingly offer up a fourth rule: An agency's failure to discharge its statutory duty of initial inquiry is harmless unless the record contains information suggesting a reason to believe that the children at issue may be "Indian child[ren]," in which case further inquiry may lead to a different ICWA finding by the juvenile court. For these purposes, the "record" means not only the record of proceedings before the juvenile court but also any further proffer the appealing parent makes on appeal.

Because the record in this case contains the parents' repeated denials of American Indian heritage, because the parents were raised by their biological relatives, and because there is nothing else in the record to suggest any reason to believe that the parents' knowledge of their heritage is incorrect or that the children at issue might have American Indian heritage, we conclude that the agency's error in this case was harmless and affirm.

## FACTS AND PROCEDURAL BACKGROUND

### I.     Facts

Mother and Luis C. (father) have two children—Dezi C. (born May 2016) and Joshua C. (born April 2018).

On November 6, 2019, mother and father got into a verbal fight. After father threatened to kill mother, mother struck

father with a broomstick while father was holding then-toddler Joshua in his arms. This was not the first such incident between the parents.

Both mother and father also have longstanding issues with substance abuse. Mother has been using methamphetamine for more than seven years; father also uses.

## II. Procedural Background

### A. *Petition, adjudication and termination of parental rights*

On December 17, 2019, the Los Angeles Department of Children and Family Services (the Department) filed a petition asking the juvenile court to exert dependency jurisdiction over Dezi and Joshua on the basis of (1) mother's and father's history of domestic violence (rendering jurisdiction appropriate under subdivisions (a) and (b)(1) of section 300), and (2) mother's and father's drug abuse (rendering jurisdiction appropriate under subdivision (b)(1) of section 300).[2]

On February 19, 2020, the juvenile court held a combined jurisdictional and dispositional hearing. The court sustained the domestic violence and substance abuse allegations under subdivision (b)(1), struck the domestic violence allegation under subdivision (a), removed the children from the parents' custody, and ordered the Department to provide both parents with family reunification services in accordance with a "case plan" developed for each parent.

At a six-month review hearing on August 26, 2020, the juvenile court concluded that mother and father were not in

---

[2] The petition also alleged that father had failed to protect the children by allowing mother to remain in the family home, but that allegation was dismissed.

4

compliance with their case plans, terminated reunification services, and set the matter for a permanency planning hearing under section 366.26.

On January 18, 2022, the juvenile court held the permanency planning hearing. After concluding that the children were adoptable and likely to be adopted by their paternal grandparents, the court terminated mother's and father's parental rights.

### B. *ICWA-related facts*

In December 2019, mother and father told a Department social worker that they had no American Indian heritage. The next day, mother and father filled out ICWA-020 forms, and checked the box indicating that they had no American Indian heritage "as far as [they knew]." At the hearing on whether to initially detain the children, mother and father told the juvenile court that they had no American Indian heritage.

While investigating the allegations in this case, the Department's social workers spoke to father's parents (the paternal grandparents), mother's parents (the maternal grandparents), father's siblings, mother's siblings, and one of father's cousins. The social workers did not ask any of these individuals whether mother, father, or the children had any American Indian heritage.

The juvenile court found "[no] reason to know that this is an Indian child, as defined under ICWA."

### C. *Appeal*

Mother filed this timely appeal from the termination of her parental rights.

## DISCUSSION

Mother argues that the order terminating her parental rights must be reversed because the Department failed to comply with its duty under ICWA and related California provisions to initially inquire of "extended family members" regarding Dezi's and Joshua's possible American Indian heritage.[3] It is undisputed that the Department's initial inquiry was deficient: As discussed more fully below, the initial duty of inquiry mandated by California's version of ICWA obligates the Department to question "extended family members" about a child's possible American Indian heritage (§ 224.2, subd. (b)); here, the Department spoke with several members of mother's and father's extended families, but did *not* question them about the children's possible heritage. The question thus becomes: Did the Department's defective initial inquiry in this case render invalid the juvenile court's subsequent finding that ICWA does not apply (and thus render invalid the court's concomitant order terminating mother's parental rights)?

"[W]e review the juvenile court's ICWA findings under the substantial evidence test, which requires us to determine if reasonable, credible evidence of solid value supports" the court's ICWA finding. (*In re A.M.* (2020) 47 Cal.App.5th 303, 314

---

[3] We reject the Department's argument that we lack appellate jurisdiction to entertain mother's challenge to the juvenile court's ICWA finding. Appeals are taken from orders (or judgments), not from factual findings relating to issues necessarily bound up in those orders (or judgments). Thus, mother's appeal from the order terminating her parental rights necessarily encompasses the ICWA findings bound up in that order. Mother's failure to mention ICWA in her notice of appeal is accordingly irrelevant.

(*A.M.*).)  Where, as here, there is no doubt that the Department's inquiry was erroneous, our examination as to whether substantial evidence supports the juvenile court's ICWA finding ends up turning on whether that error by the Department was harmless—in other words, we must assess whether it is reasonably probable that the juvenile court would have made the same ICWA finding had the inquiry been done properly.  (*People v. Watson* (1956) 46 Cal.2d 818, 836  (*Watson*).)  If so, the error is harmless and we should affirm; otherwise, we must send it back for the Department to conduct a more fulsome inquiry.

## I.    The Three Current Rules

At this point in time, the California courts have staked out three different rules for assessing whether a defective initial inquiry is harmless.  These rules exist along a "continuum."  (*In re A.C.* (2022) 75 Cal.App.5th 1009, 1011 (*A.C. 2022*).)  The rule at one end of this continuum is one that mandates reversal:  If the Department's initial inquiry is deficient, that defect necessarily infects the juvenile court's ICWA finding and reversal is automatic and required (the "automatic reversal rule").  (*In re J.C.* (2022) 77 Cal.App.5th 70, 80-82 (*J.C.*); *In re Antonio R.* (2022) 76 Cal.App.5th 421, 432-437 (*Antonio R.*); *In re A.R.* (2022) 77 Cal.App.5th 197, 205 (*A.R.*); *In re H.V.* (2022) 75 Cal.App.5th 433, 438; *In re Y.W.* (2021) 70 Cal.App.5th 542, 556; accord, *In re N.G.* (2018) 27 Cal.App.5th 474, 484-485 (*N.G.*); *In re K.R.* (2018) 20 Cal.App.5th 701, 708-709.)  Under this test, reversal is required no matter how "slim" the odds are that further inquiry on remand might lead to a different ICWA finding by the juvenile court.  (*Antonio R.*, at p. 435.)  The rule at the other end of the continuum is one that presumptively favors affirmance:  If the Department's initial inquiry is deficient, that defect will be

7

treated as harmless unless the parent comes forward with a proffer on appeal as to why further inquiry would lead to a different ICWA finding (the "presumptive affirmance rule").  (*In re A.C.* (2021) 65 Cal.App.5th 1060, 1065, 1071 (*A.C. 2021*); accord, *In re Rebecca R.* (2006) 143 Cal.App.4th 1426, 1430-1431 (*Rebecca R.*).)  The third rule lies in between:  If the Department's initial inquiry is deficient, that defect is harmless unless "the record indicates that there was readily obtainable information that was likely to bear meaningfully upon whether the child is an Indian child" and that "the probability of obtaining meaningful information is reasonable" ("the readily obtainable information rule").  (*In re Benjamin M.* (2021) 70 Cal.App.5th 735, 744 (*Benjamin M.*); *In re Darian R.* (2022) 75 Cal.App.5th 502, 509-510 (*Darian R.*); *In re S.S.* (2022) 75 Cal.App.5th 575, 581-583 (*S.S.*); *A.C. 2022*, at p. 1015.)

This diversity of rules is understandable.  That is because courts are grappling with how to assess how the *absence* of information (that is, answers to the questions about American Indian heritage that the agency never asked) might affect the juvenile court's ICWA finding.  (E.g., *Benjamin M.*, *supra*, 70 Cal.App.5th at pp. 742-743 ["we cannot know what information an initial inquiry, properly conducted, might reveal"]; *N.G.*, *supra*, 27 Cal.App.5th at p. 485 ["we simply cannot know whether [the agency] would have discovered information" bearing on American Indian heritage].)  Where there is an absence of information or proof, courts typically look to burdens of proof as the "tie-breaker":  When the party assigned the burden of proof does not produce sufficient information, that party loses.  (*Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 821; *Sargent Fletcher, Inc. v. Able Corp.* (2003) 110 Cal.App.4th 1658, 1666-

1667; Evid. Code, § 115.) Not surprisingly, the current disagreement over which rule to apply largely reduces down to a disagreement over where to assign the burden of proof. Courts adhering to the automatic reversal rule put the burden of proof on the agency to show that its failure to ask questions would be harmless, a burden the agency will never be able to carry because, by definition, it is impossible to know the answers to unasked questions. (*N.G.*, at pp. 484-485.) Courts adhering to the presumptive affirmance rule put the burden of proof on the objecting parent to show—through a proffer—that there is some information out there that, if obtained through inquiry, might alter the juvenile court's ICWA finding. (*A.C. 2021*, *supra*, 65 Cal.App.5th at p. 1070.) The third rule largely avoids the issue by focusing mostly on what is already in the record, thereby reducing the importance of who bears the burden of proof.

Despite this diversity of rules—and, indeed, perhaps because we have had the benefit of considering these rules—we propose a fourth rule for assessing harmlessness, explain why we believe this fourth rule is preferable, and explain why we respectfully decline to adopt any of the three previously formulated rules.

## II. A Fourth Rule: The "Reason To Believe" Rule and Its Rationale

In our view, an agency's failure to conduct a proper initial inquiry into a dependent child's American Indian heritage is harmless unless the record contains information suggesting a reason to believe that the child may be an "Indian child" within the meaning of ICWA, such that the absence of further inquiry was prejudicial to the juvenile court's ICWA finding. For this purpose, the "record" includes both the record of proceedings in

9

the juvenile court and any proffer the appealing parent makes on appeal.[4] To illustrate, a reviewing court would have "reason to believe" further inquiry might lead to a different result if the record indicates that someone reported possible American Indian heritage and the agency never followed up on that information; if the record indicates that the agency never inquired into one of the two parents' heritage *at all* (e.g., *Benjamin M.*, *supra*, 70 Cal.App.5th at p. 740); or if the record indicates that one or both of the parents is adopted and hence their self-reporting of "no heritage" may not be fully informed (e.g., *A.C. 2022*, *supra*, 75 Cal.App.5th at pp. 1015-1016).

We adopt this "reason to believe" rule for three reasons.

First, the "reason to believe" rule weaves together the test for harmless error compelled by our State's Constitution[5] with the cascading duties of inquiry imposed upon agencies by our State's ICWA statutes.

Our Constitution specifies that a judgment may not be "set aside" unless it "has resulted in a miscarriage of justice" (Cal. Const., art. VI, § 13), and our Supreme Court has defined a

___

[4] Considering such proffers in this context is appropriate under Code of Civil Procedure section 909. (*In re Allison B.* (May 27, 2022, B315698) [2022 Cal.App.Lexis 465, *6-9] [so holding].)

[5] We look to the California standard for harmlessness because the initial duty of inquiry at issue in this case—that is, the Department's obligation to ask the child's "extended family" under section 224.2, subdivision (b)—is purely a creature of California law, as it goes beyond the federal duty to inquire of "participants" in the juvenile court proceeding (25 C.F.R., § 23.107(a) (2022)). (Accord, *A.C. 2021*, *supra*, 65 Cal.App.5th at pp. 1069-1070; *Benjamin M.*, *supra*, 70 Cal.App.5th at pp. 741-742.)

"miscarriage of justice" as existing only when "it is reasonably probable that *a result* more favorable to the appealing party would have been reached in the absence of error" (*Watson*, *supra*, 46 Cal.2d at p. 836, italics added). Thus, our State's test for harmlessness is an *outcome*-focused test.

ICWA was enacted to curtail "the separation of large numbers of Indian children from their families and tribes through adoption or foster care placement" (*Miss. Band of Choctaw Indians v. Holyfield* (1989) 490 U.S. 30, 32), and "to promote the stability and security of Indian tribes and families by establishing . . . standards that a state court . . . must follow before removing an Indian child from his or her family" (*In re Austin J.* (2020) 47 Cal.App.5th 870, 881 (*Austin J.*); *In re Isaiah W.* (2016) 1 Cal.5th 1, 7-8 (*Isaiah W.*)). Under the ICWA and California statutes our Legislature enacted to implement it (§§ 224-224.6), as recently amended, a juvenile court—and, as its delegate, the Department—have duties all aimed at assessing whether a child in a pending dependency case is an "Indian child" entitled to the special protections of ICWA. (§§ 224.2, 224.3, added by Stats. 2018, ch. 833, §§ 5, 6; *A.M.*, *supra*, 47 Cal.App.5th at pp. 320-321 [applying ICWA law in effect at time of order appealed from].)[6] Under ICWA as amended, the Department and

---

[6] For these purposes, an "'Indian child'" is a child who (1) is "a member of an Indian tribe," or (2) "is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." (25 U.S.C. § 1903(4); § 224.1, subd. (a) [adopting federal law definition].) By its terms, this definition turns "'on the child's political affiliation with a federally recognized Indian Tribe,'" not "necessarily" "the child's race, ancestry, or 'blood

juvenile court have "three distinct duties." (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1052 (*D.S.*) [noting amendment's creation of three duties]; *Austin J.*, *supra*, 47 Cal.App.5th at pp. 883-884 [same].)  The first duty is the initial "duty" of the Department and the juvenile court "to inquire whether [a] child is an Indian child." (§ 224.2, subds. (a) & (b).)  The Department discharges this duty chiefly by "asking" family members "whether the child is, or may be, an Indian child." (*Id.*, subd. (b).)  This includes inquiring of not only the child's parents, but also others, including but not limited to, "extended family members." (*Ibid.*)  For its part, the juvenile court is required, "[a]t the first appearance" in a dependency case, to "ask each participant" "present" "whether the participant knows or has reason to know that the child is an Indian child." (*Id.*, subd. (c).)  The second duty is the duty of the Department or the juvenile court to "make further inquiry regarding the possible Indian status of the child." (*Id.*, subd. (e).)  This duty of further inquiry is triggered if the Department or court "has reason to believe that an Indian child is involved" because the record contains "information . . . suggesting the child is Indian" (*ibid.*; *D.S.*, at p. 1049; *In re Levi U.* (2000) 78 Cal.App.4th 191, 198, superseded by statute on another ground as stated in *In re B.E.* (2020) 46 Cal.App.5th 932, 940), and, once triggered, obligates the Department to conduct further interviews to gather information, to contact the Bureau of Indian Affairs and state department of social services for assistance, and/or to contact the relevant Indian tribe(s). (§ 224.2, subd. (e)(2).)  The third duty is the duty to notify the relevant Indian tribe(s). (§

---

quantum.'" (*Austin J.*, *supra*, 47 Cal.App.5th at p. 882, quoting 81 Fed.Reg. 38801-38802 (June 14, 2016).)

12

224.3, subd. (a); 25 U.S.C. § 1912(a).) This duty is triggered if the Department or the court "knows or has reason to know . . . that an Indian child is involved." (§ 224.3, subd. (a).)

Because the governing test for harmlessness is outcome focused, adapting that test to the situation in this case means courts should focus on whether it is reasonably probable that an agency's error in not conducting a proper initial inquiry affected the correctness (that is, the outcome) of the juvenile court's ICWA finding. As noted above, ICWA already provides a standard for assessing whether further inquiry is necessary after an initial inquiry—namely, if the initial inquiry provides a reason to believe that the child is an Indian child because the record contains "information . . . suggesting the child is Indian." This standard reserves further inquiry for those cases in which such inquiry may affect the juvenile court's ultimate ICWA determination. Because the question before us in assessing harmlessness is *also* whether further inquiry would affect the juvenile court's ICWA finding, the "reason to believe" standard is the logical standard to apply.

Second, the "reason to believe" rule also best reconciles the competing policies at issue when an ICWA objection is asserted in later at the final phases of the dependency proceedings. As noted above, ICWA's inquiry and notice requirements "are, at their heart, . . . about effectuating the rights of Indian tribes" by ensuring that the juvenile court determines whether a child may be an actual or potential member of an Indian tribe and by thereafter giving the pertinent tribe(s) the opportunity to make the final determination of tribal status. (*Benjamin M., supra*, 70 Cal.App.5th at pp. 740-742; *Isaiah W., supra*, 1 Cal.5th at p. 12; *In re Hunter W.* (2011) 200 Cal.App.4th 1454, 1468.) Competing

13

against that policy is the dependent child's interest in avoiding delay and the instability that comes from having the final determination of his or her permanent placement remain "up in the air." (*A.R.*, *supra*, 77 Cal.App.5th at p. 207 ["prompt resolution of [dependency] cases based on the children's need for permanency remains a significant consideration in . . . juvenile dependency cases"].)  Also in the mix is the judicial branch's interest in ensuring that the agency "gets the message" that it is critical to conduct a proper initial inquiry (*ibid.*), as well as the branch's interest in discouraging game playing by parents who hold back any objection to the adequacy of the agency's inquiry until an appeal of the termination of their parental rights in the hopes of delaying the finality of that termination (*ibid.*; *Rebecca R.*, *supra*, 143 Cal.App.4th at p. 1431).  In our view, none of these policies trumps all the others; instead, they must *all* be honored. By limiting a remand for further inquiry to those cases in which the record gives the reviewing court a reason to believe that the remand may undermine the juvenile court's ICWA finding, the "reason to believe" rule effectuates the rights of the tribes in those instances in which those rights are most likely at risk, which are precisely the cases in which the tribe's potential rights do justify placing the children in a further period of limbo.  The "reason to believe" rule also removes the incentive to use ICWA as a thirteenth-hour delay tactic and, by allowing parents to cite their proffers on appeal as well as the juvenile court record, still sends a "message" to agencies that ICWA's mandates are not to be ignored because remand will be ordered in any case where there is reason to believe the failure to inquire mattered.

Third and lastly, the "reason to believe" rule, by focusing on what is in the record rather than what is not in the record,

largely sidesteps the "how can we know what we don't know" and burden of proof conundrums that animate the automatic reversal and presumptive affirmance rules.

## III. Rejecting the Other Rules

We decline to adopt the other three rules currently in use by the appellate courts for the reasons set forth below.

### A. *The automatic reversal rule*

We decline to adopt the automatic reversal rule because we disagree with its rationale and because it inevitably leads to what we believe are undesirable consequences.

The cases adopting the automatic reversal rule appear to rest on two alternative rationales—namely, that (1) it is critical that the juvenile court be *certain* whether a dependent child may be an Indian child, and this need for certainty requires that an agency never be excused from conducting the full inquiry mandated by our State's ICWA statutes, and (2) even if something less than certainty is required, remand for a full inquiry mandated by the ICWA statutes is required because whatever the child's parents say about their American Indian heritage is inherently suspect (*J.C.*, *supra*, 77 Cal.App.5th at p. 81 ["it is not uncommon for parents to mistakenly disclaim (or claim) Indian ancestry"]; *Antonio R.*, *supra*, 76 Cal.App.5th at p. 432 [parents may lie because they are "'fearful to self-identify'"]), and because it is impossible to know what information the extended family might have unless those family members are asked.

The rationale that ICWA demands certainty appears to rest on three interlocking premises: (1) our Supreme Court held in *Isaiah W.* that the interest of the tribes in the proper determination of a dependent child's status as an Indian child is

paramount and trumps all other competing policy considerations (see *Isaiah W.*, *supra*, 1 Cal.5th at p. 12 ["the federal and state [ICWA] statutes were clearly written to protect the integrity and stability of Indian tribes *despite the potential for delay in placing the child*," italics added]; see *A.C. 2022*, *supra*, 75 Cal.App.5th at pp. 1016, 1019); (2) a tribe always has the right to collaterally attack a final judgment terminating parental rights, and the only way to stave off such collateral attacks is to remand to conduct a proper inquiry prior to the entry of judgment (*Antonio R.*, *supra*, 76 Cal.App.5th at pp. 436-437; *A.R.*, *supra*, 77 Cal.App.5th at pp. 202, 207-208); and (3) the only way to get agencies to take seriously their statutory ICWA duties is to reverse in every case when they shirk them because, otherwise, their inaction is rewarded given that the less information an agency learns, the more likely its defective analysis will be found to be harmless (*J.C.*, *supra*, 77 Cal.App.5th at p. 80).

We reject each of these premises. Although *Isaiah W.* states that ICWA values the "integrity and stability of Indian tribes" despite possible delay in permanency, the question presented in that case was whether a parent's failure to appeal a juvenile court's ICWA finding in a prior appeal precluded the parent from appealing that finding after the final judgment terminating parental rights. (*Isaiah W.*, *supra*, 1 Cal.5th at pp. 7-10.) Thus, the issue in *Isaiah W.* was whether an appellate court could examine the ICWA issue *at all*; *Isaiah W.* had no occasion to hold—and did not purport to hold—that ICWA errors, once examined, could never be harmless. To be sure, a tribe maintains a right to collaterally attack a final judgment. But that right is akin to a criminal defendant's right to collaterally attack his final judgment of conviction, and courts have never

16

viewed the possibility of such collateral attacks as warranting a rule of automatic reversal for all errors raised during the direct appeal of a criminal conviction.  There is similarly no justification for one here.  And our Supreme Court has rejected the notion that reversal is necessary to incentivize agencies to do a better job:  "[T]he price that would be paid for" the "added incentive" of "treating [an] error as . . . structural" (and hence automatically reversible), "in the form of needless reversals of dependency judgments, is unacceptably high in light of the strong public interest in prompt resolution of these cases so that the children may receive loving and secure home environments as soon as reasonably possible."  (*In re James F.* (2008) 42 Cal.4th 901, 918.)  Further, the notion that inaction will be rewarded ignores that inaction affecting the soundness of the juvenile court's ICWA finding *will* be prejudicial:  If an agency fails entirely to ask the parents about their possible American Indian heritage, as noted above, there is "reason to believe" the parents may have such heritage and the agency's inaction will demand remand.

We are also unpersuaded by the alternate rationale that failing to remand for further inquiry yields too great a probability that a dependent child may be an Indian child because parents' reports of their American Indian heritage cannot be trusted and because it is not known what information other relatives might have provided.  We decline to adopt a rule that obligates us to view with a jaundiced eye whatever parents report about their heritage, at least in the usual case where the parents were not adopted and thus can be presumed to be knowledgeable.  (Accord, *Rebecca R.*, *supra*, 143 Cal.App.4th at p. 1431 ["The knowledge of any Indian connection is a matter wholly within the appealing parent's knowledge . . . ."].)  Further, and as noted above, we

17

prefer the traditional approach to evaluating harmlessness, which looks to what is in the record (or proffered by the parent on appeal) rather than speculating about what might have been placed in the record.

In addition, the automatic reversal rule leads to what we view as three undesirable consequences.

First, it encourages parents to "game the system." The usual rule of procedure is that an error is forfeited if it is not raised, which creates an incentive to object as early as possible and thus helps ensure that errors can be fixed before the litigation is completed in the trial court. (E.g., *People v. Nieves* (2021) 11 Cal.5th 404, 451.) The automatic reversal rule perverts that incentive: If parents know that they are guaranteed an automatic remand based on an agency's failure to engage in a full inquiry as required by ICWA, they have every incentive *not* to object when they observe deficiencies in the agency's inquiry. By remaining silent, they "keep[] an extra ace up their sleeves" that will, at a minimum, guarantee a remand that forestalls the finality of the final judgment in the dependency case and, indeed, may even derail arranged adoption of the dependent children if the prospective adoptive parents cannot abide that additional delay. (*In re H.B.* (2008) 161 Cal.App.4th 115, 122; *Rebecca R.*, *supra*, 143 Cal.App.4th at p. 1431.) In this respect, the automatic reversal rule gives rise to the "very evil the Legislature intended to correct"—namely, "lengthy and unnecessary delay in providing permanency for children." (*In re Marilyn H.* (1993) 5 Cal.4th 295, 310.)

Second, the rule—in conjunction with the breadth of the duty of initial inquiry under section 224.2—may yield a seemingly endless feedback loop of remand, appeal, and remand.

18

Section 224.2 does not limit the duty of initial inquiry to "extended family members." Instead, an agency's duty "includes, *but is not limited to*, asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect." (§ 224.2, subd. (b), italics added.) Because the automatic reversal rule mandates remand if any stone is left unturned, and because section 224.2 creates an open-ended universe of stones, the rule ostensibly empowers the party to obtain a remand to question extended family members, then a second remand to question the family babysitter, and then a third remand to question long-time neighbors, and so on and so on.

Lastly, the automatic reversal rule seemingly elevates ICWA above the *constitutional* mandate that reversal is only required when there would be a miscarriage of justice. But it is well settled that constitutional provisions trump statutory law, not the other way around. (E.g., *County of Los Angeles v. Commission on State Mandates* (2007) 150 Cal.App.4th 898, 904.)

### B. *The presumptive affirmance rule*

We decline to adopt the presumptive affirmance rule because, by focusing on what a parent proffers on appeal, it ignores that the juvenile court record may provide a reason to believe that the juvenile court's ICWA finding is incorrect and that further inquiry is warranted. Where, for instance, a parent is never asked about his or her American Indian heritage or the parent's answer is of less value because the parent is adopted, the presumptive affirmance rule would mandate affirmance in the absence of proffer, even though, in our view, there is on those facts reason to believe the child may be an Indian child. By placing the onus solely on the parent to come forward with a

19

proffer of information likely to be obtained on remand, the presumptive affirmance rule not only embraces finality at the expense of the tribe's interest in ascertaining accurate determinations of the Indian status of dependent children, but does too little to incentivize agencies to conduct proper inquiries because prejudicially deficient inquires will go uncorrected if the parent is unwilling or unable to make a meaningful proffer on appeal.

C.      *The readily obtainable information rule*

Although this third rule is the closest in approach to the reason to believe rule we adopt, we nevertheless reject it for two reasons.

First, this rule focuses on whether "there was readily obtainable information . . . likely to bear meaningfully upon whether the child is an Indian child" and the "probability of obtaining meaningful information." (*Benjamin M.*, *supra*, 70 Cal.App.5th at p. 744.)  Because this rule focuses on the ease of obtaining information that bears on the question of a child's Indian status rather than whether that information is likely to affect the juvenile court's ICWA finding, this rule lacks the *outcome*-focus that is the hallmark of usual harmlessness review.

Second, this rule appears to be so flexible and malleable that some courts—and, indeed, mother in this case—have argued that it functions as a type of automatic reversal rule. Specifically, mother argues here that the Department had "readily obtainable information . . . likely to bear meaningfully upon whether [Dezi and Joshua]" were Indian children because the Department could have easily interviewed mother's and father's relatives about the children's Indian heritage when they questioned them on other topics.  The Department's failure to do

so, mother concludes, is grounds for automatic reversal. The same analysis has been hinted at in *J.C.*, *supra*, 77 Cal.App.5th at page 82, and *Antonio R.*, *supra*, 76 Cal.App.5th at pages 426, 436-437. The uncertainty of the meaning and breadth of this rule has led at least one judge to comment that the rule "merely shifts" "the battleground" to the appellate courts, where there will be skirmishes over whether information was readily obtainable. (*A.C. 2022, supra*, 75 Cal.App.5th, at p. 1020, fn. 4 (dis. opn. of Crandall, J.).)

## IV.    Application

The record in this case does not provide a "reason to believe" that Dezi and Joshua are Indian children. Both mother and father attested—to the Department, on an official form, and to the juvenile court during their initial appearances—that they had no Indian heritage. Mother and father grew up with their biological family members. Mother points to nothing else in the juvenile court's record indicating that she or father has any American Indian heritage. And mother makes no proffer on appeal that either parent has any such heritage. In these regards, the facts of this case are nearly identical to those of *Darian R.*, *supra*, 75 Cal.App.5th 502, and *S.S.*, *supra*, 75 Cal.App.5th 575. Although these other cases applied the readily obtainable information test, they came to the same conclusion as we do under the reason to believe test we adopt today: No remand is warranted.

21

## DISPOSITION

The order is affirmed.

**<u>CERTIFIED FOR PUBLICATION</u>**.

_____, J.

HOFFSTADT

We concur:

_____, Acting P. J.

ASHMANN-GERST

_____, J.

CHAVEZ